UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SIERRA CLUB,                                                                                               Plaintiff,

v.                                                                                         Civil Action No. 3:14-cv-391-DJH

LOUISVILLE GAS & ELECTRIC CO.,                                                            Defendant.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

  For many years, Defendant Louisville Gas & Electric (LG&E) has discharged treated wastewater, called "effluent," from the ash pond at the Mill Creek Generating Station directly into the Ohio River via a drain called "Outfall 002." Plaintiff Sierra Club alleges that this direct discharge occurs on a daily, almost continuous basis. In 2002, the Kentucky Division of Water issued LG&E a permit (the "Permit") that—according to both LG&E and the regulators—allows this discharge. Sierra Club asserts, however, that the practice violates the Permit's plain meaning. It brought this citizen suit under the Clean Water Act alleging that the word "occasional" on the Permit's cover page, coupled with the Permit's description of Outfall 002 as an "internal" outfall, prohibits LG&E's current practices. Moreover, it believes that the nearly continuous direct discharge from Outfall 002 has resulted in dangerously high concentrations of mercury and other pollutants in the waters downstream from Mill Creek. Both parties seek summary judgment; the Kentucky Energy and Environment Cabinet has submitted an amicus brief supporting LG&E. After hearing from the parties in oral argument and carefully considering their positions, the Court concludes that summary judgment is inappropriate at this time. It will therefore deny the cross-motions for summary judgment and order discovery to proceed.

1

# I. FACTUAL BACKGROUND

Mill Creek is LG&E's largest coal-fired power plant. It sits adjacent to the Ohio River in southwest Jefferson County. Water plays an important role in Mill Creek's operation, with four boilers burning coal to convert water into steam that spins turbines. Those turbines drive the generators that produce electricity. The four coal-fired boilers also use water from the river to cool and condense the steam that passes through the turbines back to a liquid state, and the cooling water is then discharged back into the river. River water also transports coal ash and other "combustion residuals" from the boilers to the ash pond.

Once the combustion residuals settle, the resulting effluent is discharged back into the river along with any storm water and wastewater that has entered the ash pond. The effluent is first sent over a concrete dam into a concrete reservoir called a "sump." The sump drains into two pipes: One conveys the effluent to a second pipe to combine it with cooling water before discharge into the river via Outfall 001, and the other conveys the effluent to an open, lined trench on the river bank that directly discharges into the river—Outfall 002. All of the effluent from Outfall 002 is *eventually* discharged into the Ohio River. Some of the Outfall 002 effluent reaches the river directly, while the rest flows first through the pipeline and into Outfall 001 before discharge.

The Clean Water Act[1] regulates LG&E's practices at Mill Creek. The CWA prohibits the discharge of any pollutant[2] into U.S. waters without authorization from a National Pollution Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1342. Courts have interpreted the CWA as a strict liability regime in the absence of NPDES permits. The CWA requires that

---

[1] 33 U.S.C. § 1251 *et seq*.
[2] This can include "solid waste," "chemical wastes," and "industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

pollutant dischargers monitor and publicly report the amount of pollutants discharged. *Id.* at (a)(2). NPDES permits are set for fixed terms that may not exceed five years. 33 U.S.C. 1342(b)(1)(B). The U.S. Environmental Protection Agency has delegated to the states the authority to issue and enforce NPDES permits. *See* 48 Fed. Reg. 45,597 (Oct. 6, 1983) (approving Kentucky's NPDES permitting program). In Kentucky, the Energy and Environment Cabinet (Cabinet) is the principal government entity that issues and enforces permits under the Kentucky Pollutant Discharge Elimination System. *See id*. It does so through subordinate agencies, the Kentucky Department of Environmental Protection (Department) and the Division of Water (Division), an arm of the Department, which issues NPDES permits to entities wishing to discharge pollutants from any point source into Kentucky's waters.

The Division first issued a NPDES permit to LG&E for its Mill Creek operations in 1975. That permit was subsequently renewed six times. The version at issue here, KDPES Permit KY0003221, became effective in November 2002. Though it expired in 2007—and though LG&E applied for a renewal that same year—the Division has put off reconsidering its terms, and, as a result of administrative extensions, the Permit still governs operations at Mill Creek.

According to the Permit's cover page, Parts I through V set forth all "effluent limitations, monitoring requirements, and other conditions." These sections impose water quality standards on all ash pond effluent, but the parties dispute whether they impose any limits on the effluent flow rate from the ash pond to the river, either indirectly through Outfall 001 or directly from Outfall 002. There is required effluent sampling to test for compliance with the Permit limits at Outfall 002 for all directly discharged wastewater. Thus, the monitoring results reported to the Division reflect the quality of the ash pond effluent before discharge to Outfall 001 and before direct discharge into the river from Outfall 002. LG&E claims that regardless of how often the

3

effluent is directly discharged into the river, the total flow of effluent entering the river from the ash pond is the same.

LG&E argues—and the Cabinet agrees—that Parts I through V of the Permit do not constrain the frequency of direct discharge from Outfall 002. Rather, they argue that the Permit's terms allow continuous direct discharge from Outfall 002. They note that Outfall 002 is subject to monthly average and daily discharge limitations and monitoring, even when it directly discharges into the river. As they explain, the relevant regulations—40 C.F.R. § 122.45(d)—require that "continuous" discharges be stated in terms of maximum daily and monthly average limits. This is contrary to non-continuous discharges, which must be "particularly described and limited" when it comes to frequency, total mass, and maximum rate. *Id*. § 122.45(e). The Permit contains no particularly described limitations for Outfall 002's direct discharges into the Ohio River. Likewise, the Permit contains no monitoring or reporting compliance requirements, which would be required if there were any frequency limitations on the direct discharges from Outfall 002. *See* 40 C.F.R. § 122.44(i)(1).

Meanwhile, Sierra Club focuses on the phrase "occasional direct discharge," which appears on the cover page in reference to Outfall 002. Although the phrase appears only once in the Permit, Sierra Club argues that the plain meaning of the expression is clear and unambiguously bars the near-continuous direct discharge currently flowing from Outfall 002. In full, the Permit's cover page's description of Outfall 002 is that it is authorized to discharge "to Outfall 001 with an occasional direct discharge to the Ohio River." Moreover, it points to page I-2 of the permit, which characterizes Outfall 002 as "an internal outfall that discharges to Outfall 001." That page also lists six effluent limitations that Outfall 002 must adhere to at all times, and a seventh limitation on wastewater acidity/alkalinity (pH) that applies "only when

4

[Outfall 002's wastewater] is direct discharged to the Ohio River." Sierra Club also notes that before the Permit was issued in 2002, the Department characterized Outfall 002 as "an internal outfall that discharges to Outfall 001 . . . with an occasional direct discharge to the Ohio River." And when applying for the Permit, LG&E used similar language to describe the utilization of Outfall 002: "*On occasion the ash pond water is diverted directly to the Ohio River . . . to maintain proper water level in the pond.*" (D.N. 48-1, PageID # 1501 emphasis added).

Sierra Club fears that the continuous direct discharge from Outfall 002 could pose serious human health concerns, as wastewater from Mill Creek's coal ash impoundment contains several toxic pollutants. These toxins include arsenic, mercury, lead, and cadmium. In sufficient concentrations, these toxins can have neurological and carcinogenic impacts on individuals exposed to them. As well, they are associated with a wide range of environmental harms, including the destruction of fish populations and the general reduced population growth and diminished survival rates of other aquatic organisms.

Samplings taken in 2001 and 2007[3] both show significant concentrations of mercury at Outfall 002. (D.N. 48-1, PageID # 1501) In 2001, LG&E's samplings detected mercury concentrations at Outfall 002 to be 0.30 micrograms/L. (*Id.* at PageID # 1501-02) In 2007, mercury was found at 1.1 micrograms/L at Outfall 002. *Id.* Both could be dangerously high: Kentucky regulations establish 0.051 micrograms/L as the maximum safe concentration of mercury for fish consumption. 401 KY. ADMIN. REGS. § 10:031, Table 1. Meanwhile, Outfall 001's mercury concentrations were well below detection limits. Sierra Club suggests that this is likely due to the dilution that occurs when the coal ash impoundment wastewater is combined with other flow sources—like Outfall 001's cooling water—that have not previously been

---

[3] These appear to be the most recent samplings available in the Court's record.

exposed to coal ash. (D.N. 48-1, PageID # 1502) The Department has already determined that the mercury present downstream from Mill Creek is potentially too high for safe human consumption of fish caught there.

Because of its concerns and the concerns of its members, in March 2014 Sierra Club sent notice —as is required under the Clean Water Act—to LG&E and the Department of its intent to pursue a CWA "citizen suit." The CWA provides for civil actions against any defendant allegedly in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a)(1). Any pollutant discharge not authorized by an NPDES permit is in violation. *Id.* §§ 1311(a), 1342, 1365(f)(6). In its notice, Sierra Club alleged that the daily direct discharge from Outfall 002 violated the Permit because it necessarily exceeded the standard of "occasional direct discharge" found on the cover page.

Within days of the notice, the Department's commissioner rejected Sierra Club's interpretation. He explained that the Permit allows for discharge from Outfall 002 either internally into Outfall 001 or directly into the river. He also disputed that the word "occasional" on the cover page had any limiting powers. In May 2014, Sierra Club filed suit. By agreement of the parties, discovery is stayed pending resolution of the cross-motions for summary judgment. The Court heard oral argument on the motions in July 2015.

## II. STANDARD

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56(a). The moving party bears the initial burden of identifying the basis for its motion and the parts of the record that demonstrate an absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must

determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court concludes that genuine issues of material fact do exist in this case.

## III.  DISCUSSION

To interpret the Permit, the Court will use the same principles of interpretation that apply to contracts and other legal documents. *See, e.g., Natural Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1204-05 (9th Cir. 2013). As with any contract, the Court must first interpret the Permit according to its plain meaning, and the Court will consider extrinsic evidence only if the Permit's terms are ambiguous. *See id*. Unsurprisingly, each side believes that the Permit's plain meaning supports their position.

LG&E's position is that the word "occasional" on the cover page is, by the Permit's plain meaning, a mere "descriptive term" and not an enforceable condition of the Permit. LG&E marshals several arguments to support this reading. For one, the word appears only once—on the cover page. The cover page indicates that the Permit's operating conditions are found in other portions of the Permit. (D.N. 41-4, PageID # 260)  LG&E also points to discharge limitations and monitoring requirements. The Permit subjects Outfall 002 to monthly average and daily discharge limitations and monitoring. Regulations require these standards for continuous discharges. *See* 40 C.F.R. § 122.45(d). Had "occasional" been meant as an actual condition, posits LG&E, the federal regulations would have required the Division to "particularly describe[] and limit" the direct discharge from Outfall 002. *See id*. § 122.45(e)(1). Finally, LG&E references the Permit's quality-based limits for toxicity. The Permit's toxicity limits are

7

written without regard to whether the effluent from Outfall 002 is first comingled with cooling water in Outfall 001. That is, the toxicity limitations are unaffected by whether the direct discharge is continuous or less frequent. LG&E deems this proof that that the Division never intended "occasional" to carry weight. For each of these reasons, LG&E asserts that the Permit's plain meaning supports its current practices at Mill Creek.

Meanwhile, Sierra Club argues that the only way to give effect to all of the terms of the Permit is to interpret it as precluding continuous direct discharge. That is, Sierra Club claims that reading the Permit as LG&E desires would read the terms "occasional" and "internal" out of the Permit. As to the meaning of "occasional," Sierra Club asserts that its ordinary meaning— "occurring from time to time" or "irregular"; "infrequent"—should be used. *See The Am. Heritage Dictionary of the English Language* (5th ed. 2011). And it cites several cases from a multitude of courts where other judges have deemed various forms of the root "occasion" to be unambiguous.

As to "internal," the Permit describes Outfall 002 as "an *internal* outfall that discharges to Outfall 001." (D.N. 41-4, PageID # 262) Sierra Club submits the following definition: "of, relating to, or located within the limits or surface; inner." *See id*. Reading the Permit as a whole, and giving effect to all of its terms in their plain meanings, Sierra Club argues that the only plausible interpretation is that the wastewater from Outfall 002 is meant to stay within Mill Creek until it reaches Outfall 001, with only occasional direct discharges to the Ohio River. Sierra Club also challenges LG&E's arguments about the import of the toxicity limitations and discharge limitation and monitoring requirements. Sierra Club denies that the toxicity limitations offer any probative evidence. And it notes that the regulations LG&E cites provide that non-continuous discharges must be particularly described and enumerated factors considered

8

"as appropriate." 40 C.F.R. § 122.45(e). The lack of these particular descriptions from the Permit, contends Sierra Club, merely demonstrates that the Permit never authorized or contemplated this type of direct discharge, which would make the consideration of factors like frequency, total mass, and maximum rate inappropriate.

Many courts in varied contexts have found that the plain meaning of "occasional" would preclude the type of near-continuous discharge at Mill Creek. *See, e.g., Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 879 (8th Cir. 2011) ("'[o]ccasionally' is defined as 'now and then; here and there; sometimes'"); *U.S. v. Hudspeth*, 42 F.3d 1015, 1023 n.16 (7th Cir. 1994) ("[t]he plain meaning of the term 'occasion' incorporates a temporal distinction, *i.e.*, one occasion cannot be simultaneous with another occasion"); *Miller v. Comm'r of Soc. Sec.*, No. 1:13-CV-1872, 2014 WL 3950912, at *10 (N.D. Ohio Aug. 12, 2014) ("[b]y the terms' plain meaning, 'occasional' is less frequent in nature than 'repetitive'"); *Allstate Ins. Co. v. Sylvester*, No. 07-00360, 2008 WL 2164657, at *6 (D.C. Haw. May 21, 2008) ("[t]he plain meaning of 'occasional' is 'Occurring from time to time' or 'Not habitual; infrequent'"); *Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884, 896 n.25 (E.D. Tex. 1997) (explaining that a Department of Labor handbook's use of "occasional," without definition, presumed the plain meaning of the term: "infrequent or irregular intervals"). Although these cases offer some guidance as to the meaning of "occasional" in various contexts, they do not tell the Court what the word means in the context of the Permit.

In *Hendricks v. United States*, the now-defunct federal Claims Court addressed the meaning of a flowage easement that gave the United States the right "occasionally to overflow, flood and submerge" the plaintiffs' land with water from the Harry S. Truman Dam in the Missouri River Basin. 10 Cl. Ct. 703 (1986). Like the Permit, the easement in *Hendricks* used

9

"occasionally" without defining the term. *Id.* at 705. In deciding the motion and whether to consider extrinsic evidence, the court determined that "the term 'occasionally' is inherently ambiguous," and it denied summary judgment. *Id*. 706-07. Likewise, this Court concludes that, in the context of the Permit, the meaning of "occasional" is inherently ambiguous. The interpretation that LG&E puts forth may be plausible, but it still leaves the Court with little guidance as to how the inherently ambiguous term is to be applied in the Permit. And the Court is unable, without more, to accept Sierra Club's position at oral argument that "occasional" means so infrequent as to be *de minimis*. Given the ambiguity, the Court concludes that summary judgment is inappropriate at this time.

### 1. The Amicus Brief

When there is ambiguity in a permit, courts may look to extrinsic evidence "to determine the intent of the permitting authority." *Natural Res. Def. Council*, 725 F.3d at 1207. In the event this Court found that "occasional" is ambiguous, LG&E has asked it to rely on the Cabinet's interpretation. The Cabinet submitted an amicus brief on this issue in March 2015. *See* D.N. 60. The Cabinet supports LG&E's interpretation of the Permit, based on essentially the same reasons that LG&E argued. And LG&E asserts that the Court should give deference to the Cabinet's position.

Though the Court is unable to wholly resolve the issue at this time, it does have doubts as to the weight the Cabinet's opinion should carry. As LG&E's counsel agreed at oral argument, the Permit is a form of regulation. Usually, when regulators interpret their own regulations, they receive what is called *Auer* deference.[4] That is, courts will give deference to an agency's interpretations of its own regulations—even when given in a legal brief—so long as the

---

[4] *See Auer v. Robbins*, 519 U.S. 452 (1997).

interpretation is not clearly wrong or inconsistent with the regulation, reflects the agency's fair and considered judgment on the matter, and is more than a "convenient litigating position" or a "*post hoc* rationalizatio[n] advanced by the agency seeking to defend past agency action under attack." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (alteration in original)(citations omitted)(internal quotations omitted). If a court determines that *Auer* deference is inappropriate, it can instead give the agency interpretation *Skidmore* deference,[5] which accords "deference proportional to the 'thoroughness evident in [the regulator's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id.* at 2168 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

Here, it appears to the Court that the Cabinet's decision is a *post hoc* rationalization. Indeed, the only prior pronouncement on the meaning of "occasional" came when Sierra Club gave notice of its intent to sue, and the Cabinet responded that LG&E was adhering to the terms of the Permit. Notably, this rapid response came from the same state government agency that has for over seven years been unable to advance LG&E's permit renewal request. The Court is not inclined to give the Cabinet's views deference, and so is unwilling to grant summary judgment based on the Cabinet's interpretation. More discovery is needed to flesh out the issues surrounding this case.

### 2. Discovery

Discovery was stayed in this case until the cross-motions for summary judgment could be resolved. At oral argument, the Court inquired about several subjects that, according to the parties, the record is silent on. The Court will refer all discovery matters to United States

---

[5] *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

11

Magistrate Judge Dave Whalin. As discovery proceeds, the Court specifically directs the parties to conduct discovery relating to:

- The purposes for separating Outfall 001 and Outfall 002;

- The reason behind the Division's delay in approving LG&E's permit renewal request;

- The historical direct-discharge practices from Outfall 002, any discussions that may have occurred between LG&E and the Division about direct-discharge practices from Outfall 002, and current discharge practices from Outfall 002;

- What the Division may have intended at the time the Permit was drafted; and

- Use of "occasional" in other discharge permits granted by the Cabinet, Department or Division.

## IV. CONCLUSION

Questions linger as to LG&E's current practices at Mill Creek. To give full effect to the Permit as a whole, the Court's interpretation must consider the effect of "occasional" and the Permit's description of Outfall 002 as "an internal outfall that discharges to Outfall 001." But the Court is presently unconvinced of Sierra Club's position because Sierra Club has not presented the Court with an actionable construction. Summary judgment is inappropriate at this time; discovery is needed. Accordingly, it is hereby

**ORDERED** as follows:

1. The cross-motions for summary judgment (Docket Nos. 41 and 48) are **DENIED**.

2. Discovery shall commence. Topics of discovery shall include but are not limited to the subjects set forth above.

3. Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is **REFERRED** to U.S. Magistrate Judge Dave Whalin for ruling on all non-dispositive issues, including any discovery issues.

4. In lieu of submitting a proposed amended scheduling order as contemplated in the Court's May 20, 2015 Order (D.N. 71), the parties shall jointly contact Magistrate Judge Whalin's Chambers within ten (10) days of entry of this Order to schedule a conference with the Magistrate Judge for the purpose of establishing a revised litigation plan and discovery schedule. The revised schedule shall include a settlement mediation conference.